# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| ALLISON DELLATORE and CRAIG WEITZ, Individually and on Behalf of All Others Similarly Situated, | Case No.  3:18-cv-861 |
| Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION** |
| MASONITE CORPORATION; and JELD-WEN, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Allison Dellatore and Craig Weitz ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action to recover injunctive relief, treble damages, and other appropriate relief based on Defendants Masonite Corporation ("Masonite") and JELD-WEN, Inc.'s ("Jeld-Wen") violations of federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. This lawsuit arises from an unlawful agreement between the only two vertically-integrated[1] manufacturers of doorskins and interior molded doors in North America to fix the prices of interior molded doors.

2. Plaintiffs seek to represent three Classes (defined below), consisting of persons and

---

[1] To be "vertically integrated" means that a company controls more than one stage of the supply chain (*i.e.*, Defendants here manufacture both doorskins for interior molded doors as well as interior molded doors).

entities who purchased residential interior molded doors in the United States from at least as early as October 24, 2012 through the present (the "Class Period") indirectly from either of the Defendants, their subsidiaries, affiliates, or joint-ventures for their own use and not for resale.

3.     Interior molded doors are a type of interior door made by sandwiching a wood frame and a hollow or solid core between two molded doorskins, which are composed of a high-density fibrous mat and formed into a raised panel design. They are the most popular type of interior door in North America. Interior molded doors attempt to simulate the aesthetics of solid wood doors at a lower price point. Defendants control the majority of the Interior Molded Door Market (as defined below).

4.     Interior molded doorskins are a necessary component in the creation of interior molded doors and constitute up to 70% of the cost. Prior to Masonite's exit from the Interior Molded Doorskin Market (as defined below) in 2014,[2] Defendants were the only suppliers of interior molded doorskins to third-party interior molded door manufacturers in North America. Defendants are also the only two vertically-integrated interior molded door manufacturers (*i.e.*, they manufacture both interior molded doorskins and complete interior molded doors) in the United States. Since 2014, Jeld-Wen has controlled virtually the entire Interior Molded Doorskin Market.

5.     As the interior molded doorskin used in the assembly of an interior molded door is a critical component and the most expensive input in the manufacturing process, the Interior Molded Doorskin Market and the Interior Molded Door Market are inextricably connected. Thus, Jeld-Wen and Masonite have significant power in both of the relevant product markets (defined

---

[2] Although Masonite exited the Interior Molded Doorskin Market insofar as it no longer sells interior molded doorskins to competing interior molded door manufacturers, it continues to manufacture interior molded doorskins, which are incorporated into the interior molded doors it manufactures.

below).

6.    Historically, the Interior Molded Door Market contained at least one significant non-integrated manufacturer of interior molded doorskins (Masonite), at least one significant non-integrated manufacturer of interior molded doors (Premdor, Inc.), and numerous other non-integrated interior molded door manufacturers.

7.    Recognizing there was a strong incentive by interior molded door manufacturers to collude to increase the price of interior molded doors, the Department of Justice ("DOJ") in 2001 conditioned Premdor, Inc.'s and Premdor U.S. Holdings, Inc.'s (collectively, "Premdor") acquisition of Masonite (and the consequential creation of a vertically-integrated manufacturer of both interior molded doorskins and interior molded doors) on Premdor/Masonite's divesting an interior molded doorskin manufacturing plant in Towanda, Pennsylvania to a new entity called CraftMaster Manufacturing, Inc. ("CMI"). CMI was intended to stand alone as a competitive force in the Interior Molded Doorskin Market.

8.    However, in 2012, Defendant Jeld-Wen acquired CMI, thereby eliminating the check on competition established by the DOJ's required divestiture.

9.    Additionally, between 2001 and 2012, both Jeld-Wen and Masonite also eliminated competition by respectively acquiring a number of smaller residential interior door manufacturers.

10.    Defendants have also jointly sought to eliminate competition by halting their longstanding practices of supplying interior molded doorskins to smaller interior molded door manufacturers. Specifically, pursuant to Defendants' unlawful agreement, Masonite announced in 2014 it would no longer sell interior molded doorskins to other interior molded door manufacturers. This unprecedented shift in business practice was against Masonite's own economic interests, as it explicitly handed over the entire Interior Molded Doorskin Market to Jeld-

Wen and did so at a time when Jeld-Wen's doorskins were of poor quality. Around the same time, Jeld-Wen began taking adverse actions against third-party door manufacturers with which it had long-term supply agreements for doorskins by, among other things, raising prices notwithstanding its own declining costs and prematurely terminating supply agreements. This conduct undermined the ability of independent manufacturers to compete with Defendants in the sale of interior molded doors.

11.    This market structure has enabled Defendants to repeatedly impose uniform price increases on interior molded doors without any competitive constraints. Additionally, Defendants communicated regularly regarding their pricing intentions. Numerous high-ranking executives have crossed over from one Defendant company to the other and have maintained close relationships dating back to the 1980s.

12.    These collusive pricing practices have harmed Plaintiffs and the Classes (defined below) who have paid more for interior molded doors than they would have paid absent the collusion and unlawful conduct. As a direct and proximate result Defendants' conspiracies to: (i) monopolize the market for Interior Molded Doorskins; and (ii) fix prices of Interior Molded Doors, Plaintiffs and other members of the Classes paid more during the Class Period for interior molded doors than they otherwise would have paid in a competitive market and have, therefore, been injured in their respective businesses and property.

13.    Moreover, because interior molded doorskins are a necessary component of interior molded doors, any lessening of competition in the interior molded doorskins business necessarily results in a lessening of competition in the interior molded doors industry.

14.    Elements of Defendant Jeld-Wen's anticompetitive conduct have already been proven as a matter of law. On June 29, 2016, Steves and Sons, Inc. ("Steves") filed an antitrust

4

action against Jeld Wen alleging violations of Section 7 of the Clayton Act, breach of contract, breach of warranty, and trespass to chattels against Jeld-Wen. [3]

15.     On February 5, 2018, the jury returned a verdict in Steves' favor finding Jeld-Wen had violated Section 7 of the Clayton Act, awarding $9,933,602 in damages arising from overcharges on interior molded doorskins and $46,480,581 for future lost profits. The court noted that "as the jury found, and the record shows, ***the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry***." Emphasis added).

16.     On October 5, 2018, the district court granted Steves' motion for "extraordinary equitable relief, *i.e.*, the divestiture of Jeld-Wen's doorskins manufacturing plant in Towanda, Pennsylvania that was acquired by Jeld-Wen through a 2012 merger with CMI.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. §§ 26) to secure equitable and injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), Section 2 of the Sherman Act (15 U.S.C. § 2), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d)

---

[3] *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 3:16-cv-545 (E.D. Va. June 29, 2016)

and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

19.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

20.     This Court has *in personam* jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold interior molded doors throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing and conspiracy to monopolize that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracies in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.

21.     The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

22.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs

and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to monopolize the market for interior molded doorskins, and to fix, raise, maintain and/or stabilize prices in the United States for interior molded doors, which conspiracies unreasonably restrained trade and adversely affected the Interior Molded Door Market.

23. Defendants' conspiracies and wrongdoing described herein adversely affected persons in the United States who indirectly purchased interior molded doors and interior molded doorskins in the United States from either of the Defendants.

## RELEVANT MARKETS

24. The geographic market affected by Defendants' illegal activities is the United States, including all of its states and territories.

25. There are two relevant product markets within the United States: (1) the market for the manufacture, distribution, and sale of interior molded doorskins ("Interior Molded Doorskin Market"); and (2) the market for the manufacture, distribution, and sale of residential interior molded doors ("Interior Molded Door Market"). Prior to October 2012, when the Defendants' collusive behavior began, Defendants were each other's only major competitors in each market.

**A.      Interior Molded Doorskin Market**

26. The Interior Molded Doorskin Market is a relevant product market.

27. A doorskin is the component which makes up the front and back of an interior molded door. A doorskin is formed from a fibrous material, such as wood chips or sawdust, which are softened in a digester, refined with wax and resin, and then formed into a mat. The mat is cut into sheets and then loaded into a hot press. After coming off the press, the resulting doorskin is sized, trimmed, primed or painted, packed, and shipped to a door manufacturer.

28. Prior to Masonite's exit from the Interior Molded Doorskin Market in 2014, Jeld-

Wen and Masonite were the only suppliers of interior molded doorskins to third-party interior molded door manufacturers in North America. After 2014, Jeld-Wen now controls 100% of the Interior Molded Doorskin Market.

**B.     Interior Molded Door Market**

29.     The Interior Molded Door Market is a relevant product market.

30.     Doors used in the interiors of new homes throughout the United States are predominately molded doors, which are significantly less expensive than solid wood doors. An interior molded door is made by sandwiching a wood frame and a hollow or solid core between two interior molded doorskins.

31.     Interior molded doors are made of a type of composite wood used in residential construction and remodeling, including the construction and remodeling of multi-family and apartment housing, and for closets, rooms, and hallways. Interior molded doors attempt to simulate the aesthetics of solid wood doors at lower prices and are the most popular interior door in North America. The doors at issue in this Complaint are residential interior molded doors.

32.     Interior composite wood door manufacturers sell to distributors, building supply outlets, home centers, and lumber yards. Consumers purchasing doors to repair, renovate or remodel an existing home typically purchase doors from retail building supply outlets. Builders and contractors purchase doors primarily from distributors, lumber yards, home centers and building supply outlets.

33.     Interior molded doorskins are the primary input in the manufacture of interior molded doors. The Interior Molded Door Market and Interior Molded Doorskin Market are, therefore, inextricably intertwined. Two interior molded doorskins are required for each composite wood door. Interior molded doorskins constitute the largest input cost of a molded door,

comprising up to 70% of the cost of manufacturing a molded door.

34.     Defendants control and are the only two vertically-integrated manufactueres in the Interior Molded Door Market (*i.e.*, they manufacture both interior molded doorskins and complete interior molded doors) in the United States.

**C.      Relevant Geographic Market: The United States**

35.     The relevant geographic market is the United States, including all its states and territories. The United States is the geographic area of competition in which Defendants operate and to which Plaintiffs and the members of the Classes can practicably turn for supply of products in the relevant markets listed above.

36.     Consumers in the United States typically purchase interior molded doorskins and interior molded doors from local or regional distributors, retail locations in the areas where they reside or work, or online.

37.     Moreover, smaller foreign doorskin manufacturers in Turkey, Romania, Australia, China, and Thailand are unable to supply doorskins of a sufficient quantity, quality, and range of product lines necessary to satisfy the needs of U.S. door manufacturers.[4] As such, Defendants are the only manufacturers of doorskins used for interior molded doors manufactured in the U.S., controlling nearly 100% of the U.S. market.[5]

38.     Even assuming that comparable products are sold outside of the United States for less money, consumers are unlikely to travel outside of the United States to purchase these products because the cost of doing so would outweigh any purported savings. Similarly, even assuming that

---

[4]   *Laurel, Mississippi Plant Tour: Management Presentation*, Masonite, *available at* https://s21.q4cdn.com/840201055/files/doc_presentations/2014/Laurel-Presentation-FINAL.pdf (last accessed Oct. 24, 2018), at p. 12.
[5]   *Laurel, Mississippi Plant Tour: Management Presentation*, Masonite, *available at* https://s21.q4cdn.com/840201055/files/doc_presentations/2014/Laurel-Presentation-FINAL.pdf (last accessed Oct. 24, 2018), at p. 23.

these products are sold on a foreign company's website for less money, consumers are unlikely to purchase such products because of additional fees and shipping expenses associated with international shipping.

39.     As a result, Defendants are able to increase the price of their interior molded doorskins and interior molded doors in the United States: (1) without large numbers of consumers quickly turning to alternative suppliers located outside of the United States; and (2) without manufacturers located outside of the United States flooding the United States with substitute supply.

**PARTIES**

40.     Plaintiff Allison Dellatore is an individual who resides in Mastic Beach, New York. Ms. Dellatore purchased one or more interior molded doors indirectly for her own use and not for resale from one or both of the Defendants during the Class Period.

41.     Plaintiff Craig Weitz is an individual who resides in Ardsley, New York. Mr. Weitz purchased one or more interior molded doors indirectly for his own use and not for resale from one or both of the Defendants during the Class Period.

42.     Defendant Masonite is a corporation organized under the laws of Delaware. Masonite's principal place of business is One Tampa City Center, 201 North Franklin Street, Suite 300, Tampa, Florida 33602. Masonite is a wholly owned subsidiary of Masonite International Corporation ("Masonite International"). Masonite is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

43.     Defendant Jeld-Wen is a corporation organized under the laws of Delaware. Jeld-Wen's principal place of business is 2645 Silver Crescent Drive, Charlotte, North Carolina 28273. Jeld-Wen is a wholly owned subsidiary of JELD-WEN Holding, Inc. Jeld-Wen is registered with

the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

## FACTUAL ALLEGATIONS

### A.     Defendants Unlawfully Acquired Market Power in the Interior Molded Door Market

44.     A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

45.     Since the 1990s, there has been considerable consolidation among the manufacturers of interior molded doors. Specifically, shortly after Jeld-Wen became vertically-integrated in the 1990s, it rapidly purchased independent interior molded door manufacturers. Among its acquisitions, Jeld-Wen acquired Michigan Birch Door and its Doorcraft division.[6] Jeld-Wen also acquired an interior door manufacturing plant from Young Door in 1990,[7] and Morgan Door Co. in 1998.[8]

46.     In September 2000, International Paper Company sold Masonite to Premdor, the largest manufacturer and merchandiser of interior molded doors in the world at the time. Premdor's market position at that time was also the product of an aggressive series of mergers and acquisitions in the late 1980s and 1990s, including a merger in 1989 with Century Wood Door, one of the largest door manufacturers in the United States at the time.[9] In 1998, Premdor acquired the door

---

[6] *Door Maker to Plead Guilty to Price-Fixing*, WALL STREET JOURNAL, (Aug. 30, 1996), *available at* https://www.wsj.com/articles/SB841356486145864500 (last accessed Oct. 28, 2018).
[7] *Jeld-Wen Closing Alabama Door Plant*, WINDOW & DOOR, (Oct. 21, 2010), *available at* https://windowanddoor.com/news-item/companies/jeld-wen-closing-alabama-door-plant (last accessed Oct. 26, 2018).
[8] *Jeld-Wen Closing Oshkosh Door Plant*, WINDOW & DOOR, (June 8, 2009), *available at* https://windowanddoor.com/news-item/companies/jeld-wen-closing-oshkosh-door-plant (last accessed Oct. 26, 2018).
[9] *Masonite International Corporation History*, FUNDING UNIVERSE, *available at* http://www.fundinguniverse.com/company-histories/masonite-international-corporation-history/ (last accessed Oct. 26, 2018).

fabrication operations of Georgia Pacific in 1998.[10]

47.     After Premdor's acquisition of Masonite in 2000, there was substantial additional consolidation that eliminated competition amongst interior molded doorskin manufacturers.

- In 2002, Masonite International, Masonite's parent company, acquired the remaining interests in Fibramold, the only other interior molded doorskin manufacturer besides Jeld-Wen and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite in 2000.[11] After Masonite International's acquisition of Fibramold, it was renamed Masonite Chile S.A.

- In 2002, Masonite International also acquired a majority ownership interest in Sacopan Inc., a Canadian company, which manufactured wood composite interior molded doorskins at in Sacré-Coeur, Québec. From that time, Sacopan operated as a subsidiary of Masonite.[12]

- In 2008, Masonite International acquired the remaining interest in Sacopan.[13]

48.     Moreover, after Premdor acquired Masonite, Jeld-Wen, Masonite International, and

---

[10]     George Stalk, *et. al*, *Hardball: Are You Playing to Win?*, *available at* https://books.google.com/books?id=cscGBgAAQBAJ&pg=PA134&lpg=PA134&dq=premdor+georgia+pacific+1998&source=bl&ots=PvSPkDKsMD&sig=JNDEqee8okVJbPI7rRJru9phKAE&hl=en&sa=X&ved=2ahUKEwjYysiVo6reAhVL2oMKHZ6VB_UQ6AEwAXoECAgQAQ#v=onepage&q=premdor%20georgia%20pacific%201998&f=false (last accessed Oct. 28, 2018), at p. 134.

[11]     *Form 40-F*, U.S. SECURITIES AND EXCHANGE COMMISSION, (Dec. 2002), *available at* https://www.sec.gov/Archives/edgar/data/893691/000009095703000655/t09675e40vf.htm (last accessed Oct. 24, 2018).

[12]     *Company Overview of Sacopan, Inc.*, BLOOMBERG, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=11810529 (last accessed Oct. 26, 2018).

[13]     *Masonite International Corporation Announces Acquisition of Additional Shares of a Canadian Subsidiary*, BUSINESSWIRE, (June 20, 2008), *available at* https://www.businesswire.com/news/home/20080630006418/en/Masonite-International-Corporation-Announces-Acquisition-Additional-Shares (last accessed Oct. 24, 2018).

the newly formed CMI continued to acquire residential door manufacturers. For example:

- In 2005, CMI acquired C&S Door, a residential door manufacturer founded in 1976 with plants in Christiansburg, Virginia, and Ozark, Alabama. As a result of this acquisition, CMI became a vertically-integrated manufacturer.[14]

- In February 2010, CMI acquired Illinois Flush Door Co. in Plainfield, Illinois, a manufacturer and distributer of a full line of interior doors, which had been in business since 1944.[15]

- In March 2010, Masonite Inc. acquired Ledco, Inc. (previously known as Lake Erie Door Company), a premier interior door manufacturer that had been in the business of selling door products since 1964, and which had a strong wholesale customer base east of the Rockies.[16]

- In October 2010, Masonite Inc. acquired Lifetime Doors, Inc., an interior door manufacturer specializing in molded, veneer, prefinished, and bifold doors that had been manufacturing and selling high quality door products since 1947.[17]

- In October 2012, Jeld-Wen acquired CMI, the manufacturer and marketer of interior molded doors and doorskins that operated a manufacturing plant in

---

[14]   *Company Overview of C&S Door Corporation*, BLOOMBERG, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=6547033 (last accessed Oct. 26, 2018).

[15]   *Company Overview of Illinois Flush Door, Inc.*, BLOOMBERG, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=30969312 (last accessed Oct. 26, 2018).

[16]   *Masonite Complete Acquisition of LEDCO*, MASONITE, (Mar. 17, 2010), *available at* https://investor.masonite.com/investors/press-releases/press-release-details/2010/Masonite-Completes-Acquisition-of-LEDCO/default.aspx (last accessed Oct. 26, 2018).

[17]   *Masonite Complete Acquisition of Lifetime Doors Inc.*, MASONITE, (Oct. 8, 2010), *available at* https://investor.masonite.com/investors/press-releases/press-release-details/2010/Masonite-Completes-Acquisition-of-Lifetime-Doors-Inc/default.aspx (last accessed Oct. 26, 2018).

Towanda, Pennsylvania, which the DOJ required Premdor to divest in 2001 to alleviate competitive concerns arising out of Premdor's acquisition of Masonite from International Paper.

- In September 2015, Jeld-Wen announced its acquisition of Karona, Inc., a manufacturer of residential doors based in Caledonia, Michigan.[18]

- In August 2017, Jeld-Wen acquired Milliken Millwork, Inc., a leading provider of doors and related value-added services in the Midwest region of the United States that was founded in 1953.[19]

- In April 2018, Jeld-Wen acquired American Building Supply, Inc. a provider of residential doors, millwork, and related value-added services based in Sacramento, California.[20]

49.   This industry consolidation has resulted in Jeld-Wen and Masonite controlling a commanding share of the Interior Molded Door Market, with the rest controlled by a handful of small, regional interior molded door manufacturers.[21]

50.   The competitive landscape that emerged in the wake of Jeld-Wen's 2012 acquisition of CMI consisted of two dominant, vertically-integrated interior molded door manufacturers with incentives to coordinate, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in 2001.

---

[18] *Company Overview of Karona, Inc.*, BLOOMBERG, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=6813788 (last accessed Oct. 26, 2018).

[19] *JELD-WEN Holding announces acquisition of Milliken Millwork*, SEEKING ALPHA, (Aug. 25, 2017), *available at* https://seekingalpha.com/news/3291806-jeld-wen-holding-announces-acquisition-milliken-millwork (last accessed Oct. 26, 2018).

[20] *JELD-WEN Holding, Inc. Announces Completion of American Building Supply, Inc. Acquisition*, BUSINESSWIRE, *available at* https://www.businesswire.com/news/home/20180402005313/en/JELD-WEN-Holding-Announces-Completion-American-Building-Supply (last accessed Oct. 26, 2018).

[21] *2014 Spring Investor Presentation*, MASONITE, https://s21.q4cdn.com/840201055/files/doc_presentations/2014/Wells-Fargo-Conference-Presentation-Final.pdf (last accessed Oct. 26, 2018).

51.     By 2000, Masonite and Jeld-Wen dominated the Interior Molded Doorskin Market.[22] A third entity, Fibramold, a Chilean joint venture in which Premdor had an equity interest, accounted for less than 10% of the interior molded doorskins used for the manufacture of interior molded doors in the United States.[23] These were the only three firms with significant sales of interior molded doorskins in the United States at that time, as a small number of other interior molded doorskins manufacturers each sold less than one percent of the interior molded doorskins in the United States.[24]

52.     In 2000, Premdor was the dominant manufacturer in the Interior Molded Door Market, with a more 40% share of that market. Jeld-Wen was the only other large domestic producer of interior molded doors.[25] Nine other non-vertically-integrated interior molded door manufacturers each had a market share of less than 5%.[26]

53.     In 2001, the DOJ filed a civil antitrust action seeking to block the acquisition of Masonite by Premdor and alleging that Premdor's acquisition of Masonite and related assets would violate Section 7 of the Clayton Act.[27]

54.     As the DOJ explained, allowing Premdor to acquire Masonite's interior molded doorskin business would create a new vertically-integrated manufacturer that would harm

---

[22] *United States v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation; Proposed Final Judgment and Competitive Impact Statement*, FEDERAL REGISTER (Aug. 28, 2001), *available at* https://www.federalregister.gov/documents/2001/08/28/01-21645/united-states-v-premdor-inc-premdor-us-holdings-inc-international-paper-company-and-masonite (last accessed Oct. 25, 2018).

[23] *United States v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation; Proposed Final Judgment and Competitive Impact Statement*, FEDERAL REGISTER (Aug. 28, 2001), *available at* https://www.federalregister.gov/documents/2001/08/28/01-21645/united-states-v-premdor-inc-premdor-us-holdings-inc-international-paper-company-and-masonite (last accessed Oct. 25, 2018).

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *United States v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation; Proposed Final Judgment and Competitive Impact Statement*, FEDERAL REGISTER (Aug. 28, 2001), *available at* https://www.federalregister.gov/documents/2001/08/28/01-21645/united-states-v-premdor-inc-premdor-us-holdings-inc-international-paper-company-and-masonite (last accessed Oct. 25, 2018).

competition in the downstream Interior Molded Door Market:

> Masonite acts as a significant competitive constraint in the interior molded door market. Premdor and the non-party firm [Jeld-Wen] have an incentive to attempt to coordinate pricing by reducing output. Coordination would reduce the output of interior molded doors, and lead to higher door prices. However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite. Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non- vertically integrated door manufacturers. After the proposed transaction, a vertically integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company would be competing against those door manufacturers, and would benefit from an increase in the prices of interior molded doors.[28]

55.     The DOJ further explained that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated Jeld-Wen:

> Documentary evidence obtained from the defendants suggests that the non-party firm [Jeld-Wen], as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm [Jeld-Wen] to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's [Jeld-Wen's] incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.[29]

56.     In order to address these competitive concerns, as a condition for allowing Premdor to acquire Masonite, the DOJ required Premdor to divest assets related to the production of molded doorskins at a facility in Towanda, Pennsylvania, including the Towanda plant, as well as an

---

[28] *Id.*
[29] *Id.*

exclusive world-wide right to the "CraftMaster" name and molded doorskin design names, intellectual property related to the manufacture and sale of molded doorskins, a customer list, and the right to hire Masonite employees.[30]

57.     This divestiture resulted in the creation of CMI, a third U.S. manufacturer of interior molded doorskins and a stand-alone competitive force. CMI was created to maintain competition in the Interior Molded Door Market with CMI manufacturing and selling all designs and sizes of interior molded doorskins that Masonite sold at the time in the United States. After completion of the acquisition, Premdor changed its name to Masonite International Corp.

58.     In an October 5, 2018 post-trial opinion on the issue of divestiture in *Steves & Sons, Inc. v. JELD-WEN, Inc*., Civ. No. 3:16-cv-545, 2018 WL 4855459 (E.D. Va. Oct. 5, 2018), a case in which an independent interior molded door manufacturer successfully brought a Section 7 claim against Jeld-Wen, Judge Payne stated the following:

> Here, as the jury found, and the record shows, ***the merger [between Jeld-Wen and CMI] substantially reduced competition in the doorskin industry***. Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, ***thereby depriving the Independents [non-vertically integrated door manufacturers] of that key component of a reliable supply source.***
>
> . . . Although the Court could solve Steves' supply problem by ordering JELD-WEN to supply Steves' requirements for a long term, ***that alternate remedy would not restore competition in the industry as a whole***. And, ***the record proves that the lessened competition has adversely affected the Independents [non-vertically integrated door manufacturers]*** *other than Steves*. So simply securing a long-term supply for Steves ***would not aid those manufacturers***.

*Id.* at *38 (emphasis added).

59.     A high degree of concentration facilitates the successful operation of a price-fixing

---

[30] *Id.*

conspiracy because it gives competitors transparency into one another's production capabilities and capacity. Because of their high collective market shares for each product, Defendants were able to, and did exercise market power, including the ability to raise prices and erect barriers to entry to the both the Interior Molded Door Market and Interior Molded Doorskin Market.

**B.    The Structure and Other Characteristics of the Interior Molded Door Market Support the Existence of a Conspiracy**

60.    The structure and other characteristics of the Interior Molded Door Market make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive. Specifically, the Interior Molded Door Market (1) is a highly concentrated oligopoly; (2) has significant barriers to entry; (3) concerns a product for which there are no economic substitutes; (4) concerns standardized products with a high degree of interchangeability, and (5) is comprised of participants who had ample opportunities to conspire

**1.    The Interior Molded Door Market is Conducive to Collusion Because of the Existence of High Barriers to Entry**

61.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Specifically, with regard to interior molded door sales in the United States, high barriers to entry, especially those artificially erected by Defendants, have prevented entrants into the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels.

62.    According to Masonite, the "manufacturing process of a door is complex and it requires a high level of capital, significant process know-how, and a distributed strategic plant network to provide . . . customers with the high-quality products and industry-leading service

levels that they've come to expect and demand."[31]

63.      Analysts estimate that it takes four years and more than $200 million to set up a factory to produce doors on a large scale.[32] Specifically, according to a leading financial website, a new entrant would have 5 times the cost of existing players with a minimum of a $100 million investment per plant, and multiple plants are needed.[33]

64.      Additionally, since interior molded doorskins are a necessary input for interior molded doors, entry into the Interior Molded Door Market requires access to interior molded doorskins. There are at least three barriers to entry in the Interior Molded Doorskin Market: (1) prohibitive startup costs to open manufacturing facilities that can provide an ample variety of molded doors styles; (2) significant IP and trademarks, which can result in costly litigation; and (3) a national distribution network. The Masonite presentation below estimates that to enter the Interior Molded Doorskin Market, requires an investment of approximately $160 million to $204 million and each step of production "[p]oses [u]nique [c]hallenges."

---

[31] *Investor Day: Masonite*, BLOOMBERG TRANSCRIPT (Mar. 2, 2018).
[32] Avi Salzman, *Masonite Is A Cheap Housing Play*, BARON'S ONLINE (Aug. 1, 2015).
[33] *The Long Case For Masonite International*, SEEKING ALPHA, (Jun. 11, 2017), *available at* https://seekingalpha.com/article/4080385-long-case-masonite-international (last accessed Oct. 26, 2018).



65.    Moreover, even if a new entrant had adequate resources to commit to the development of an interior molded doorskin business, they might be then subject to potentially ruinous patent litigation brought by Defendants. In a filing with the United States Securities and Exchange Commission, Jeld-Wen represented that it "rel[ies] primarily on patent, trademark, copyright, and trade secret laws and contractual commitments to protect [its] intellectual property and other proprietary rights.[34] Similarly, in a 2016 Securities and Exchange Commission filing, Masonite represented:

> We protect the intellectual property that we develop through, among other things, filing for patents in the United States and various foreign countries. In the United States, we currently have 213 design patents and design patent applications and 172 utility patents and patent applications. We currently have 197 foreign design patents and patent applications and 283 foreign utility patents and patent applications.[35]

---

[34]  Jeld-Wen Holding, Inc., *Final Prospectus*, SECURITIES AND EXCHANGE COMMISSION, *available at* https://www.sec.gov/Archives/edgar/data/1674335/000119312517345857/d459059d424b4.htm (last accessed Dec. 11, 2018).

[35]  Masonite International Corporation, *Form 10-K*, SECURITIES AND EXCHANGE COMMISSION, *available at* https://www.sec.gov/Archives/edgar/data/893691/000089369116000072/a2015form10-k.htm (last accessed Dec. 11, 2018).

66.     The high barriers to entry in both the Interior Molded Door Market and Interior Molded Doorskin Market helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the Interior Molded Door Market to undermine their collusive prices and pricing terms.

### 3.     Price Inelasticity for Interior Molded Doors Makes the Market Susceptible to Collusion

67.     The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic. Collusion is often associated with inelastic demands, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.[36]

68.     Pricing for interior molded doors is highly inelastic, in large part because no close substitutes exist for interior molded doors. Interior doors are a necessity for residential buildings for new construction markets, and if an interior door is broken, it must be replaced. Solid wood doors are not close substitutes for interior molded doors because they are significantly more expensive and are typically used only in the most expensive homes. Flush doors with hardboard or veneered doorskins are not close substitutes for interior molded doors because they are of poorer quality and lack the aesthetically-pleasing designs of interior molded doors, and are therefore less attractive to consumers and are typically used only in entry-level homes or in utility rooms and garages.

69.     A hypothetical small but significant increase in the price of interior molded doors by a cartel would not cause a significant number of purchasers to utilize other doors in lieu of

---

[36] Susan Athey, *et. al.*, *Collusion and Price Rigidity*, (Mar. 2000) *available at* http://web.mit.edu/athey/www/absrev1f.pdf (last accessed Oct. 26, 2018).

interior molded doors, nor would such a hypothetical price increase cause enough customer turn-over to render the increase unprofitable. Historically, changes in the price of interior molded doors have not had a significant impact on the demand for hardboard or veneered flush doors.

70.     Because the price for interior molded doors is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenues.

### 4.     Interior Molded Doors are Standardized Products with a High Degree of Interchangeability

71.     Both Masonite and Jeld-Wen make very similar models of interior molded doors. These interior molded doors do not differ significantly in quality, appearance, or use. As a result, those interior molded door models are functionally interchangeable.

72.     When products are interchangeable, the primary way to compete is solely on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products.

73.     Where a product like an interior molded door is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 5.     Defendants Had Opportunities to Conspire with Each Other

74.     Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contracts and to perform acts necessary for the operation and furtherance of the conspiracies. At least throughout the Class Period, the interior molded door industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of interior molded doors, through trade association meetings and analyst phone calls.

75.     Masonite International, Masonite's parent company,[37] and Jeld-Wen[38] are members of the Window & Door Manufacturers Association ("WDMA"), a trade association that has been in existence since 1927, originally known as the National Door Manufacturers Association. Senior executives from both Jeld-Wen and Masonite currently serve on the Board of Directors of the WDMA.[39] The WDMA holds a number of annual meetings where Defendants had the opportunity to meet and discuss pricing, including the Spring Meeting & Legislative Conference jointly sponsored by the National Lumber & Building Material Dealers Association, the Executive Management Conference, the National Architectural Door Conference, and the Technical & Manufacturing Conference.[40]

76.     Masonite International and Jeld-Wen are both members of the National Fenestration Ratings Council.[41] Defendants or their parent companies are members of and/or attended meetings organized by the World Millwork Alliance[42] and the Northeastern Retail Lumber Association.[43] Masonite International[44] and Jeld-Wen[45] are also both product partners with Energy star and representatives from both companies have attended at least one conference

---

[37] *Member Directory*, WDMA, https://www.wdma.com/members/?id=20179760 (last accessed Oct. 28, 2018).
[38] *Member Directory*, WDMA, https://www.wdma.com/members/?id=20180371 (last accessed Oct. 28, 2018).
[39] *Board of Directors*, WDMA, https://www.wdma.com/page/BoardofDirectors (last accessed Oct. 28, 2018).
[40]                         Community                         Calendar,                         WDMA,
https://www.wdma.com/events/event_list.asp?show=past&group=&start=&end=&view= (last accessed Oct. 28, 2018).
[41]     *NFRC     Member     Community*,     NATIONAL     FENESTRATION     RATINGS     COUNCIL,
https://www.nfrccommunity.org/page/MemberList? (last accessed Oct. 28, 2018).
[42] *Masonite Explains its New Online Venture*, WORLD MILLWORK ALLIANCE, (July 25, 2017), *available at* https://worldmillworkalliance.com/masonite-explains-new-online-venture/ (last accessed Oct. 28, 2018); *Jeld-Wen Announces New CFO*, WORLD MILLWORK ALLIANCE, (Oct. 24, 2017), https://worldmillworkalliance.com/jeld-wen-announces-new-cfo/ (last accessed Oct. 28, 2018).
[43]     LBM     Expo     2018,     NORTHEASTERN     RETAIL     LUMBER     ASSOCIATION,     *available     at* https://www.nrla.org/NRLA/LBM_Expo/Exhibitor_and_Sponsor_Listing.aspx (last accessed Oct. 28, 2018).
[44]     *ENERGY     STAR     Partner     List     Results*,     ENERGY     STAR     *available     at* https://www.energystar.gov/index.cfm?fuseaction=estar_partner_list.showPartnerResults&company_name=masonite&s_code=ALL&partner_type_id=ALL&cntry_code=ALL&award_search=N (last accessed Oct. 28, 2018)
[45]     *ENERGY     STAR     Partner     List     Results*,     ENERGY     STAR     *available     at* https://www.energystar.gov/index.cfm?fuseaction=estar_partner_list.showPartnerResults&company_name=jeld-wen&s_code=ALL&partner_type_id=ALL&cntry_code=ALL&award_search=N (last accessed Oct. 28, 2018).

together.[46] Defendants or their parent companies also attended other trade shows and conventions, such as The International Builders' Show, which is organized by the National Association of Home Builders, which takes place in January or February each year in Orlando or Las Vegas.[47]

77.     Both Masonite and Jeld-Wen (or their parent companies) held IPOs in 2013 and 2017, respectively. Masonite and Jeld-Wen and their parent companies are covered by several of the same financial analysts and executives. Representatives from each Defendant often attend and present at the same annual investor conferences, such as the J.P. Morgan Homebuilding & Building Products Conference,[48] the Baird Global Industrial Conference,[49] and the Deutsche Bank Global Industrials and Materials Summit.[50]

78.     The opportunities for collusion are significantly enhanced because the interior molded door industry is a network comprised of the same players who have been working together since the 1980s. Specifically, a number of senior executives have worked for both Masonite and Jeld-Wen and hold close professional relationships with their former colleagues. For example,

---

[46] *ENERGY STAR Attendee List*, ENERGY STAR *available at* https://www.energystar.gov/ia/partners/prod_development/archives/downloads/windows_doors/Attendee_List.xls?8 fd5-1967 (last accessed Oct. 28, 2018).

[47] *NAHB International Builders' Show*, NAHB, *available at* https://web.nahb.org/Search/ExhibitorList.aspx (last accessed Oct. 28, 2018).

[48] *Masonite International Corporation to Present at the J.P. Morgan Homebuilding and Building Products Conference*, MASONITE, (May 8, 2018), *available at* https://investor.masonite.com/Investors/press-releases/press-release-details/2018/Masonite-International-Corporation-to-Present-at-the-JP-Morgan-Homebuilding-and-Building-Products-Conference/default.aspx (last accessed Oct. 28, 2018); *JELD-WEN Holding, Inc. to Participate in J.P. Morgan 2018 Homebuilding and Building Products Conference*, BUSINESSWIRE, (May 8, 2018), *available at* https://www.businesswire.com/news/home/20180510005327/en/JELD-WEN-Holding-Participate-J.P.-Morgan-2018-Homebuilding (last accessed Oct. 28, 2018).

[49] *Masonite International Corporation to Present at Baird's 2018 Global Industrial Conference*, BARRONS, (Oct. 25, 2018), *available at* https://www.barrons.com/articles/PR-CO-20181025-921582 (last accessed Oct. 28, 2018); *JELD-WEN Holding, Inc. to Participate in Baird 2017 Global Industrial Conference*, BUSINESSWIRE, (Oct. 26, 2017), *available at* https://www.businesswire.com/news/home/20171026006509/en/JELD-WEN-Holding-Participate-Baird-2017-Global-Industrial (last accessed Oct. 28, 2018).

[50] *Masonite International Corporation to Present at the Annual Deutsche Bank Industrials & Materials Summit*, MASONITE, (May 30, 2018), *available at* https://investor.masonite.com/Investors/press-releases/press-release-details/2018/Masonite-International-Corporation-to-Present-at-the-9th-Annual-Deutsche-Bank-Industrials--Materials-Summit/default.aspx (last accessed Oct. 28, 2018); *JELD-WEN Holding, Inc. to Participate in the Annual Deutsche Bank Global Industrials & Materials Summit*, BUSINESSWIRE, (May 31, 2017), *available at* https://www.businesswire.com/news/home/20170531006234/en/JELD-WEN-Holding-Participate-Deutsche-Bank-Global-Industrials (last accessed Oct. 28, 2018).

Philip Orsino, who served as Chief Executive Officer and President of Jeld-Wen from August 2011 to March 2014, previously served as the chief executive at Masonite and its predecessor entities from 1984 to 2005.[51] After Orsino became chief executive at Jeld-Wen, he brought other former Masonite employees to work at Jeld-Wen. A Sales Manager at Masonite under Orsino's leadership from 2002 to 2010 left Masonite and now works as the Vice President of Sales at Jeld-Wen.[52] The current Vice President and General Manager of Jeld-Wen in North Carolina has been there since October 2012, but previously served as a Managing Director for Masonite International in South Korea from 1996 to 2003.[53]

79.     During the conspiracies alleged herein, Bob Merrill, served as Executive Vice President of Sales & Marketing at Jeld-Wen, was previously CEO of CMI when it was acquired by Jeld-Wen, and was formerly a Masonite executive for 19 years.[54]

80.     Other former Jeld-Wen employees are now employed at Masonite. For example, an individual who was a Regional Sales Manager at Jeld-Wen from 2004 to March 2009 and a Regional Manager at CMI from August 2009 to September 2012, when it was acquired by Jeld-Wen, is now a Product Sales Manager at Masonite.[55] Additionally, a Vice President of Sales and Marketing at Masonite from 1988 to 2007 served as Vice President of Sales and Marketing at Jeld-Wen from 2011 to 2016.[56]

81.     Through communications with colleagues whom they had known and worked with

---

[51] *Onex Completes Investment in JELD-WEN*, JELD-WEN, (Oct. 3, 2011), *available at* http://www.jeld-wen.com/en-us/about/newsroom/press-events?view=article&id=/381-onex-completes-investment-in-jeld-wen (last accessed Oct. 28, 2018).
[52] *Christopher Mercier*, LINKEDIN, https://www.linkedin.com/in/christopher-mercier-a33208aa/?trk=seokp-title-professional-name (last accessed Oct. 28, 2018).
[53] *Stephen Fancher*, LINKEDIN, https://www.linkedin.com/in/stephen-fancher-72525a169/?trk=seokp-title-professional-cta (last accessed Oct. 28, 2018).
[54] *Bob Merrill*, LINKEDIN, https://www.linkedin.com/in/bob-merrill-5b8b24/ (last accessed Oct. 28, 2018).
[55] *Daryl Breymeyer*, LINKEDIN, https://www.linkedin.com/in/darylbreymeyer/ (last accessed Oct. 28, 2018).
[56] *Joe Wathey*, LINKEDIN, https://www.linkedin.com/in/joe-wathey-4832716/ (last accessed Oct. 28, 2018).

for years at competing companies, Masonite and Jeld-Wen shared information about their intentions to raise prices and the amount of those price increases before they were known to the public. According to a recently-filed lawsuit, decisions regarding pricing at Masonite were made after one of its vice presidents traveled, returned with Jeld-Wen's planned price increases, and told a co-worker the pricing Masonite planned to implement. The vice president advised his co-worker that Masonite always had "the Jeld-Wen information," what Jeld-Wen's price increases would be before the price increases were publicly announced, and that at least from 2012 until the vice president's departure from Masonite in 2014, Masonite never undercut Jeld-Wen's prices for interior molded doors. This was the case even when Masonite's profit margin could have handled a lower sale price in an effort to capture more market share.

### 6.   Defendants are Recidivist Violators of Antitrust Laws

82.   The residential door industry for years has been highly concentrated, and there is a history of antitrust violations by door manufacturers. In the 1990s, the DOJ investigated collusion in the residential door industry and several door manufacturers, including Defendants' predecessors and subsidiaries, pleaded guilty to conspiring to fix the prices of residential doors and paid substantial fines. In connection with this investigation, roughly $9 million in criminal antitrust fines were assessed.[57]

- In 1994, Premdor, the predecessor to Masonite, pleaded guilty and paid a $6 million fine.[58]

- In 1994, Illinois Flush Door Inc., which was subsequently acquired by CMI and in turn acquired by Jeld-Wen, pleaded guilty and agreed to pay a $160,000

---

[57] *Michigan Door Manufacturer Agrees to Plead Guilty and Pay $1.55 Million Fine For Price Fixing*, DEPARTMENT OF JUSTICE, (Aug. 29, 1996), *available at* https://www.justice.gov/archive/atr/public/press_releases/1996/0859.htm (last accessed Oct. 26, 2018).

[58] Sharon Walsh, *Door Manufacturer to Pay $6 Million Fine for Fixing Prices*, WASHINGTON POST, (June 15, 1994), *available at* https://www.washingtonpost.com/archive/business/1994/06/15/door-manufacturer-to-pay-6-million-fine-for-fixing-prices/dc1d4cba-6402-4d59-b5e3-28be0f9bba2b/?noredirect=on&utm_term=.067bb78a2fcd (last accessed Oct. 26, 2018).

criminal fine.[59]

- In 1994, LEDCO, Inc., which was subsequently acquired by Masonite, pleaded guilty and agreed to pay a $250,000 criminal fine.[60]

- In 1996, Michigan Birch Door Manufacturers Inc., a subsidiary of Jeld-Wen, pleaded guilty and agreed to pay a $1.55 million criminal fine.[61]

## C.      The Conspiracy to Fix Prices of Interior Molded Doors

83.      According to RBC Capital, "[a] series of recent acquisitions has turned the [Interior Molded Door Market] into a duopoly, with Masonite and Jeld-Wen each controlling about 40% of the residential [door] market [as a whole]."[62] This duopoly power has allowed Defendants to consistently raise prices in the Interior Molded Door Market without a decrease in demand. In fact, Masonite raised prices four times between 2013 and 2015, according to FBR Capital.[63]

84.      Additionally, as depicted in the graphs below, both Defendants have experienced significant increases in profitability throughout the duration of the Class Period. Masonite (referred to below as its ticker, "DOOR") has experienced significant rising profits since 2012.[64]

---

[59] *Annual Report on Developments in Competition in the United States*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, (Oct. 1, 1994 through Sept. 30, 1995), *available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1996--Annual%20Report%20on%20Developments%20in.pdf (last accessed Oct. 26, 2018), at p. 12.

[60] *Annual Report on Developments in Competition in the United States*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, (Oct. 1, 1994 through Sept. 30, 1995), *available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1996--Annual%20Report%20on%20Developments%20in.pdf (last accessed Oct. 26, 2018), at p. 12.

[61] *Business Briefly*, THE HARTFORD COURANT, (Aug. 30, 1996), *available at* http://www.courant.com/news/connecticut/hc-xpm-1996-08-30-9608300213-story.html (last accessed Oct. 26, 2018).

[62] Avi Salzman, *Masonite Is A Cheap Housing Play*, BARON'S ONLINE (Aug. 1, 2015).

[63] Avi Salzman, *Masonite Is A Cheap Housing Play*, BARON'S ONLINE (Aug. 1, 2015).

[64] *Underappreciated Operational Efficiency Could Boost Masonite Sales*, FORBES, (May 10, 2018), *available at* https://www.forbes.com/sites/greatspeculations/2018/05/10/underappreciated-operational-efficiency-could-boost-masonite-shares/#1c76c1765eb1 (last accessed Oct. 26, 2018).



Similarly, Jeld-Wen has experienced consistent rising EBITDA margins throughout the duration of the conspiracy.[65]



85.    As it discussed in its annual reports, during this time Jeld-Wen shifted from its old strategy that focused on increasing market share which "often led to competing on price" to a new

---

[65] *Q4 and Full Year 2017 Results Presentation*, JELD-WEN WINDOWS & DOORS, (Feb. 21, 2018), *available at* http://investors.jeld-wen.com/~/media/Files/J/Jeld-Wen-IR/reports-and-presentations/jeld-q4-2017-earnings-presentation.pdf (last accessed Oct. 29, 2018).

strategy Jeld-Wen characterized as "pricing optimization."[66] When sales forces have incentives to pursue increases in market share, such incentives can run counter to cartel activity. For this reason, a shift away from a pricing policy focused on increasing market share can be suggestive of a conspiracy.

86.    Defendants' price increases cannot rationally be explained by normal market forces, such as key input costs, and supply and demand factors. Raw materials prices for wood, resin, wax, oil, sealer, paint, and packaging, as well as prices for natural gas, electricity, and boiler fuel decreased while Defendants increased their prices.

87.    Starting at least as early as 2012, Defendants engaged in a conspiracy to raise, fix, maintain and or stabilize the prices of interior molded doors. Specifically, since Jeld-Wen's 2012 acquisition of CMI, Jeld-Wen and Masonite have adopted numerous uniform price increases on interior molded doors.

88.    These price increases were larger and in a different form than prior price increases. Historically, price increases would be in amounts such as 25 cents or $1 per door. According to a recently-filed lawsuit, beginning around 2012, Defendants began increasing prices by percentages.

| Company | Notice Date | Effective Date | Increase |
|---|---|---|---|
| Jeld-Wen | 11/15/2012 | 2/4/2013 | 3-5% |
| Masonite | 12/6/2012 | 3/18/2012 | 3-6% |
|  |  |  |  |
| Jeld-Wen | 8/6/2013 | 10/7/2013 | 4% |
| Masonite | 8/13/2013 | 9/30/2013 | 5% |
|  |  |  |  |
| Masonite | 10/31/2013 | 2/3/2014 | 5% |
| Jeld-Wen | 11/18/2013 | 1/27/2014 | 5% |

[66]Amendment No. 6 to FORM S-1 Registration Statement Under the Securities Act of 1933: JELD-WEN Holding, Inc., SECURITIES AND EXCHANGE COMMISSION, (Jan. 17, 2017), *available at* https://www.sec.gov/Archives/edgar/data/1674335/000119312517010414/d305299ds1a.htm (last accessed Oct. 28, 2018); *Jeld-Wen Holding Inc (JELD)*, MARKETSCREENER, *available at* https://www.marketscreener.com/JELD-WEN-HOLDING-INC-33385197/news/JELD-WEN-Management-s-Discussion-and-Analysis-of-Financial-Condition-and-Results-of-Operations-fo-26117569/ (last accessed Oct. 28, 2018).

| | | | |
|---|---|---|---|
| Jeld-Wen | 6/9/2014 | 8/11/2014 | 9.5% |
| Masonite | 6/17/2014 | 8/18/2014 | 8% |
| | | | |
| Masonite | 12/1/2014 | 3/2/2015 | 5-7% |
| Jeld-Wen | 12/3/2014 | 3/2/2015 | 5-6% |
| | | | |
| Masonite | 10/26/2015 | 2/1/2016 | 3-5% |
| Jeld-Wen | 10/28/2015 | 2/1/2016 | 3-5% |
| | | | |
| Masonite | 10/4/2016 | 1/1/2017 | 5-7% |
| Jeld-Wen | 10/18/2016 | 1/3/2017 | 5% |
| | | | |
| Jeld-Wen | 3/6/2018 | 5/7/2018 | 6% |
| Masonite | 3/2018 | 6/1/2018 | 6% |
| | | | |
| Jeld-Wen | 10/8/2018 | 12/7/2018 | 7% |
| Masonite | 10/8/2018 | 12/15/2018 | 7-9% |

89.     In 2014, Jeld-Wen's management team began to strategically change its pricing strategy that had previously "often led to competing on price" to a new strategy emphasizing "pricing optimization."[67] A shift in pricing policy from increasing market share to increasing unit profits is consistent with conspiratorial pricing behavior.

90.     Defendants' price increases alleged herein cannot rationally be explained by normal market forces, such as key input costs or supply and demand factors. The largest input cost of interior molded doors are interior molded doorskins. Since Defendants are vertically-integrated, they control those costs and their price increases have outpaced any increase in their raw material and other costs.

91.     During the Class Period, Masonite never undercut Jeld-Wen's pricing for interior

---

[67]Amendment No. 6 to FORM S-1 Registration Statement Under the Securities Act of 1933: JELD-WEN Holding, Inc., SECURITIES AND EXCHANGE COMMISSION, (Jan. 17, 2017), *available at* https://www.sec.gov/Archives/edgar/data/1674335/000119312517010414/d305299ds1a.htm (last accessed Oct. 28, 2018); *Jeld-Wen Holding Inc (JELD)*, MARKETSCREENER, *available at* https://www.marketscreener.com/JELD-WEN-HOLDING-INC-33385197/news/JELD-WEN-Management-s-Discussion-and-Analysis-of-Financial-Condition-and-Results-of-Operations-fo-26117569/ (last accessed Oct. 28, 2018).

molded doors, even if Masonite's profit margin could have allowed for a lower sales price in an effort to take more market share.

92.    Defendants' ability to raise prices has been facilitated by their refusal to provide interior molded doorskins to third-party interior molded door manufacturers as evidenced by the fact that Defendants imposed the largest of these increases after Masonite abruptly stopped selling interior molded doorskins to third-party independent door manufacturers in 2014.

93.    Prior to Jeld-Wen's acquisition of CMI in 2012, Masonite, CMI, and Jeld-Wen each aggressively competed in the sale of interior molded doorskins to smaller, independent, non-integrated door manufacturers, such as Steves, Lynden Door Inc., Haley Bros., Unidoor Corporation, Excel Interior Door, and ABS.

94.    In seeking regulatory approval of the CMI acquisition, Jeld-Wen tried to assuage concerns held by these independent door manufacturers and the DOJ that the acquisition would hurt competition in the Interior Molded Doorskin Market. It did so by entering into long-term supply agreements with several of these independent interior molded door manufacturers. As a result of these supply agreements and Jeld-Wen's representations concerning the continued supply of interior molded doorskins, the DOJ did not challenge Jeld-Wen's acquisition of CMI.

95.    Defendants' gained additional leverage to effectuate their unlawful price-fixing conspiracy in 2014 when, pursuant to Defendants' agreement, and in furtherance of their conspiracy to fix prices of interior molded doors, Masonite announced during an investor presentation on June 25, 2014 that it would no longer supply interior molded doorskins to third-parties:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller . . . door assembly manufacturers have to get their facing [i.e., doorskins]

31

from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into—to competition. ***So, that only leaves one other outlet for them to get their facings from in North America.*** (emphasis added).

96.     Masonite offered no explanation for why it was exiting the Interior Molded Door Market. But Masonite's statement, explicitly acknowledging that its exit would leave Jeld-Wen as the only option for competing interior molded door manufacturers to purchase doorskins from, leaves little room for interpretation. It is clear that Masonite intended to cede its entire share in Interior Molded Doorskins Market to Jeld-Wen.

97.     Masonite's ongoing refusal to sell interior molded doorskins to other interior molded door manufacturers is against Masonite's economic self-interest absent a conspiracy with Jeld-Wen. Because interior molded doorskins are the primary component of interior molded doors, a manufacturer's ability to control the Interior Molded Doorskin Market directly impacts the Interior Molded Door Market. Masonite has excess capacity in its interior molded doorskin production facilities and, due to the significant upfront and fixed costs of interior molded doorskin manufacturing plants, would be incentivized to increase sales in order to maximize production of and revenue from interior molded doorskins. Masonite's exit from the Interior Molded Doorskin Market is all the more suspicious given the fact that Jeld-Wen, its only real competitor, was experiencing pronounced and protracted quality control issues with its interior molded doorskins. It is implausible that, absent an anti-competitive agreement with Jeld-Wen, Masonite would exit a market in which it would have been poised to dominate given its largest competitor's quality control issues.

98.     By exiting the Interior Molded Doorskin Market, Masonite gave Jeld-Wen monopoly power in the Interior Molded Doorskin Market. Jeld-Wen was then able to use its power

in the Interior Molded Doorskin Market to raise prices in the Interior Molded Door Market. In effect, without competition from Masonite, Jeld-Wen has the ability to price its interior molded doorskins at a supracompetitive level or at a sub-par quality to limit competition from third-party interior molded door manufacturers in the Interior Molded Door Market.

99.     Jeld-Wen has, in fact, utilized its dominant position in the Interior Molded Doorskin Market, facilitated by its acquisition of CMI and its agreement with Masonite, to harm independent interior molded door manufacturers. Contrary to its representations to the DOJ as to the competitive significance of its long-term supply relationships with third-party interior molded door manufacturers, Jeld-Wen's relationship with those independent manufacturers has been extremely contentious, particularly since Masonite's departure from the Interior Molded Doorskin Market. Faced with these difficulties in sourcing interior molded doorskins, Steves, a smaller door manufacturer that purchased interior molded doorskins from Jeld-Wen, filed a complaint against Jeld-Wen in 2016.  The complaint alleged that Jeld-Wen's 2012 acquisition of CMI undermined its ability to compete in the Interior Molded Door Market, and harmed competition, in violation of Section 7 of the Clayton Act. Steves and Jeld-Wen had a long-term supply agreement, but Jeld-Wen sent a notice of termination in September 2014, effective September 2021.

100.    When threatened with the loss of interior molded doorskins from Jeld-Wen, Steves sought alternative sources of supply. It approached Masonite, but Masonite refused to enter into a long-term supply agreement and would only sell to Steves on a spot basis at ***37% higher*** than the prices Jeld-Wen charged under its supply agreement with Steves. Prior to Masonite's exit from the Interior Molded Doorskin Market in 2014, Steves was able to purchase millions of interior molded doorskins from Masonite. Also  in 2012, Masonite had offered to enter into a long-term supply relationship with Steves prior to Steves entering into such a relationship with Jeld-Wen.

101.     According to the Steves' Complaint, Steves also explored sourcing its doorskins from foreign suppliers, but was unable to fulfill its doorskin requirements from those suppliers. Interior molded doorskins manufactured outside of the United States are only used to a limited extent in the United States with foreign suppliers only offering a finite selection of designs and sizes of questionable quality. In 2018, a jury found in favor of Steves and awarded nearly $60 million in total damages.

102.     In sum, Jeld-Wen and Masonite's unlawful conduct has undermined the ability of independent door manufacturers to compete with Defendants in the sale of interior molded doors, enabling Defendants to impose numerous matching anticompetitive price increases on the members of the Classes.

## CLASS ALLEGATIONS

103.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Injunctive Class"):

> **Nationwide Injunctive Class**
> All persons or entities who indirectly purchased interior molded doors for their own use and not for resale in the United States from either of the Defendants, their subsidiaries, affiliates, or joint-ventures at any time from October 24, 2012 to the present.

104.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to antitrust, unfair competition, consumer protection, and unjust enrichment laws. The claims are brought on behalf of the following class (the "Price-Fixing Damages Class"):

> **Price-Fixing Damages Class**
> All persons or entities residing in the states listed below who indirectly purchased interior molded doors for their own use and not for resale in the United States from either of the Defendants, their

subsidiaries, affiliates, or joint-ventures at any time from October 24, 2012 to the present.

105.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the antitrust laws of New York. The claims are brought on behalf of the following class (the "Conspiracy to Monopolize Damages Class"):

> **Conspiracy to Monopolize Damages Class**
> All persons or entities residing in New York who indirectly purchased interior molded doors for their own use and not for resale in the United States from either of the Defendants, their subsidiaries, affiliates, or joint-ventures at any time from October 24, 2012 to the present.

106.    The Nationwide Injunctive Class, the Price-Fixing Damages Class, and the Conspiracy to Monopolize Damages Classes are referred to herein, collectively as the "Classes." The Price-Fixing Damages Class and the Conspiracy to Monopolize Damages classes are collectively referred to herein as the "Damages Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased interior molded doors directly or for resale.

107.    Because such information is in the exclusive control of the Defendants, Plaintiffs do not know the exact number of the members of the Classes. Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands, if not tens of thousands, of members in each Class and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all members of the Classes is impracticable.

108.    Plaintiffs are members of the Classes; Plaintiffs' claims are typical of the claims of

the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are indirect purchasers of interior molded doors from one or more of the Defendants, and their interests are coincident with and not antagonistic to those of the other members of the Classes. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

109.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain and/or stabilize the prices of interior molded doors in the United States;

(b)     Whether Defendants engaged in a combination or conspiracy among themselves to enable Jeld-Wen to monopolize the Interior Molded Doorskin Market;

(c)     The identity of additional participants of the alleged combinations or conspiracies, if any;

(d)     The duration of the alleged combinations or conspiracies and nature and character of the acts carried out by Defendants in furtherance of the combinations or conspiracies;

(e)     Whether the alleged combinations or conspiracies violated Sections 1 and 2 of the Sherman Act;

(f)     Whether the combinations or conspiracies had the effect of artificially inflating

the price of interior molded doors sold in the United States during the Class Period;

(g)   Whether the alleged conspiracies violated state antitrust, unfair competition, and/or consumer protection laws;

(h)   Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and members of the Damages Classes, thereby entitling Plaintiffs and members of the Damages Classes to disgorgement of all benefits derived by Defendants;

(i)   Whether Defendants' conduct caused injury to the members of the Classes;

(j)   Whether Defendants undertook actions to conceal their unlawful conspiracies;

(k)   The appropriate injunctive and related equitable relief for the Nationwide Injunctive Class; and

(l)   The appropriate measure and amount of damages incurred by the Damages Classes.

110.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' unlawful conduct in that they were damaged by Defendants' actions, which caused them to pay artificially inflated prices for interior molded doors. There are no defenses that are unique to Plaintiffs.

111.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

112.   Class action treatment is a superior method for the fair and efficient adjudication of

the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

113.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ACCRUAL OF CLAIM, CONTINUING VIOLATION,
EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT**

114.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their conspiracies and, therefore, Plaintiffs and members of the Classes were unaware of Defendants' conspiracies or of facts sufficient to place it on notice of the conspiracies or the claims set forth herein.

**A.      Active Concealment of the Conspiracies**

115.    Through their misleading, deceptive, false and fraudulent statements and material omissions, Defendants effectively concealed their conspiracies, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the

Classes into paying unjustifiably higher prices for interior molded doors.

116. These false statements and others made by Defendants helped conceal the illegal conspiracies entered into by Defendants to monopolize the market for interior molded doorskins and to fix, stabilize, maintain and raise the price of interior molded doors to artificially inflated levels.

117. In fact, Defendants have publicly stated that they have policies in place to ensure compliance with federal and state laws.

118. Masonite's publicly available antitrust compliance policy[68] provides:

> Fair trade and competition laws – often referred to as "antitrust laws" – vary from country to country and, in some cases, even within a single country depending on the jurisdiction.
>
> As a general rule, these laws:
>
> - Prohibit agreements or understandings between competitors that undermine competition;
>
> - Regulate the behavior of dominant companies; and
>
> - Require prior review and in some instances clearance for mergers, acquisitions and certain other transactions, in order prevent transactions that would substantially reduce competition.
>
> Every country where Masonite does business has some form of fair trade, competition, or antitrust law. Thus, you should be fully familiar with Masonite's Antitrust Policy as it applies to where you do business. If you have any doubt about whether a practice is legal or permitted under Masonite's policies, you should contact the Legal Department immediately.
>
> **II. OUR POLICY**
>
> - **Never** enter into an agreement or an understanding with a competitor, or a group of competitors, about any aspect of Masonite's business without the approval of the Legal

---

[68] *The Masonite Values Operating Guide*, MASONITE, (Sept. 5, 2019), *available at* https://www.masonite.com/wp-content/uploads/2017/12/masonite-values-guide.pdf (last accessed Oct. 26, 2018).

Department. Many, if not most, agreements with a competitor are criminal offenses that can result in large fines and prison terms.

- **Do not ever agree** with a competitor about: (1) Masonite's prices or terms and conditions of sale; (2) which customers Masonite will or will not sell to, or in what geographic areas it will sell or not sell; or (3) the price that Masonite will bid or offer to a customer or class of customers. These agreements are always illegal, and will result in your **immediate** dismissal.

119.    Jeld-Wen's publicly available antitrust compliance policy[69] states:

Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct. Directors, officers and employees should avoid situations from which an unlawful agreement could be inferred. By bringing competitors together, trade associations can raise antitrust concerns, even though such groups serve many legitimate goals. The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and should be avoided.

120.    Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Classes from at least October 24, 2012 through at least June 29, 2016, when residential door manufacturer Steves filed its Complaint for Injunctive and Declaratory Relief, Damages, and Specific Performance against Jeld-Wen, for the first time publicly disclosing facts pertaining to Defendants' anticompetitive conduct and illegal scheme. Before Steves' June 29, 2016 complaint, Plaintiffs and the Classes did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute

---

[69] *Code of Business Conduct and Ethics*, JELD-WEN, (Jan. 27, 2017), *available at* http://www.jeld-wen.com/images/pdf/Code_of_Business_Conduct_and_Ethics_2017.pdf (last accessed Oct. 26, 2018) at p. 4.

of limitations through at least June 29, 2016.

**B.      Plaintiffs Exercised Reasonable Diligence**

121.    Defendants' anticompetitive conspiracies, by their very nature, were self-concealing. When Plaintiffs and members of the Classes received pricing information from one or both of Defendants, Plaintiffs reasonably considered the Interior Molded Door Market to be competitive. Jeld-Wen's October 24, 2012 acquisition of CMI consolidated the Interior Molded Doorskin Market into a duopoly, and further greatly consolidated the Interior Molded Door Market. Price increases following the creation of a duopoly market are not unexpected due to limited competition, and thus, Plaintiffs and the Classes had no reason to suspect that Defendants' price increases on interior molded doors were anything but merely a consequence of the duopoly Interior Molded Doorskin Market and further consolidation in the Interior Molded Door Market. While interdependent price increases are not unlawful, coordination of pricing and price increases among competitors is. Plaintiffs and the Classes had no reason to investigate, and no way to know that these prices were higher than they should have been due to the conspiracies and the unlawful anticompetitive conduct alleged herein before June 29, 2016.

122.    Plaintiffs and members of the Classes under the circumstances would not have been alerted to investigate the legitimacy of Defendants' pricing and price increases before Steves' June 29, 2016 complaint, particularly in light of the DOJ's approval of the acquisition.

123.    Because of Defendants' concealment of their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracies at an earlier date by the exercise of reasonable diligence.

124.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful

conduct. Despite the exercise of reasonable diligence, Plaintiffs and the other members of the Classes were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for interior molded doors throughout the United States during the Class Period.

125.    For these reasons, Plaintiff's claims are timely under both the federal laws identified herein.

## INTERSTATE TRADE AND COMMERCE

126.    The conduct of Defendants has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*, during the relevant period:

(a)     Defendants sold and distributed interior molded doors throughout the United States;

(b)     Defendants have each used instrumentalities of interstate commerce to manufacture, sell, distribute, and market interior molded doors throughout the United States; and

(c)     Defendants manufactured, sold, and shipped substantial quantities of interior molded doors in a continuous and uninterrupted flow of interstate commerce to customers located in other states than the states in which Defendants produced interior molded doors.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

127.    Defendants' unlawful combination and conspiracies has had the following effects, among others:

(a)     price competition has been restrained, suppressed, or eliminated with respect to the sale of interior molded doors;

(b)     prices charged for interior molded doors by Defendants have been fixed, raised,

maintained, or stabilized at artificially high and non-competitive levels; and

(c)     purchasers of interior molded doors from Defendants, including Plaintiffs and members of the Classes, paid more for interior molded doors than they would have paid in a competitive marketplace, unfettered by Defendants' collusive and unlawful price fixing.

128.    During and throughout the period of the contract, combination, or conspiracies alleged above, Plaintiffs and members of Classes purchased interior molded doors indirectly for their own use and not for resale from Defendants in the United States.

129.    The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of interior molded doors, and the doorskins contained therein, in the United States.

130.    As a direct and proximate result of the alleged violations of the antitrust laws, Plaintiffs and members of the Classes have sustained injury to their businesses or property, having paid higher prices for interior molded doors than they would have paid in the absence of Defendants' illegal contracts, combinations, or conspiracies, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

131.    The economic and legal literature has recognized that in a multi-level chain of distribution, such as exists here, an overcharge will be felt throughout the chain of distribution. As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the
> overcharge will be passed on by distributors to end consumers. When the
> distribution markets are highly competitive, as they are here, all or nearly
> the entire overcharge will be passed on through to ultimate
> consumers…Both of Microsoft's experts also agree upon the economic
> phenomenon of cost pass through, and how it works in competitive markets.
> This general phenomenon of cost pass through is well established in
> antitrust laws and economics as well.[70]

132.    Additionally, Professor Herbert Hovenkamp, a renowned antitrust scholar has

stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND

ITS PRACTICE (1994):

> A monopoly overcharge at the top of a distribution chain generally results
> in higher prices at every level below. For example, if production of
> aluminum is monopolized or cartelized, fabricators of aluminum cookware
> will pay higher prices for aluminum. In most cases they will absorb part of
> these increased costs themselves and pass part along to cookware
> wholesalers. The wholesalers will charge higher prices to the retail stores,
> and the stores will do it once again to retail consumers. Every person at
> every stage in the chain likely will be poorer as a result of the monopoly
> prices at the top.
>
> Theoretically, one can calculate the percentage of any overcharge that a firm
> at one distributional level will pass on to those at the next level.

133.    Consequently, while the direct purchasers were the first to pay supracompetitive

prices, some or all of the overcharge was passed along the distribution chain and absorbed by

Plaintiffs and members of the Damages Classes when they purchased interior molded doors from

stores or distributors.

134.    The economic harm to Plaintiffs and members of the Damages Classes can be

quantified. Commonly-used and well-accepted economic models can be used to measure both the

extent and the amount of the supracompetitive charges passed through the chain of distribution.

## FIRST CLAIM FOR RELIEF

---

[70] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

**Violation of the Sherman Act, Sections 1 and 2, 15 U.S.C. §§ 1, 2**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

135.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

136.     Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of interior molded doors in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

137.     Plaintiffs and the other members of the Nationwide Injunctive Class have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Nationwide Injunctive Class have paid more for interior molded doors than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

138.     In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including:

> (a)      participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of interior molded doors in the United States;

> (b)      issuing price increase announcements and selling interior molded doors at the agreed upon prices; and

> (c)      participating in meetings and conversations among themselves to

implement, adhere, and police the agreements they reached.

139. Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to monopolize the market for interior molded doorskins.

140. Defendants intentionally combined and conspired to afford Jeld-Wen a monopoly over the Interior Molded Doorskin Market. Defendants effected this conspiracy by, among other things, agreeing that Masonite would not sell interior molded doorskins to any interior molded door manufacturer that competed against Defendants. Pursuant to this unlawful agreement, Masonite discontinued its sales of interior molded doorskins to competing interior molding door manufacturers, and has repeatedly refused to supply its competitors.

141. For the reasons discussed above, Defendants acted with specific intent to effectuate Jeld-Wen's monopoly in the Interior Molded Doorskin Market in order to eliminate competition in the downstream Interior Molded Doors Market so they could effectuate their conspiracy to fix prices in that related market.

142. As a direct and proximate result of Defendants' conspiracy to monopolize the Interior Molded Doorskin Market: (i) Jeld-Wen has charged supracompetitive prices to its customers for interior molded doorskins; (ii) Jeld-Wen has provided its customers with lower quality interior molded doorskins; (iii) interior molded door manufacturers that compete with Defendants have limited access to interior molded doorskins, the primary input for interior molded doors; and (iv) Defendants have been able to charge supracompetitive prices for interior molded doors.

143. Accordingly, Plaintiffs and the Nationwide Injunctive Class seek injunctive relief

and costs of suit, including reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Price-Fixing Damages Class)**

144. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

145. During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of interior molded doors in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

146. The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the prices for interior molded doors in the United States.

147. Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

148. Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Arizona Revised Statutes, §§ 44-1401,** *et seq*.

(a) Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Arizona; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

149.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **California Business and Professions Code, §§ 16700, *et seq.***

(a)     During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of interior molded doors at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of interior molded doors.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the

following: (1) fixing, raising, stabilizing, and pegging the price of interior molded doors.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of interior molded doors has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for interior molded doors sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased interior molded doors directly or indirectly from Defendants have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property in that they paid more for interior molded doors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, members of the Price-Fixing Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **District of Columbia Code Annotated §§ 28-4501, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) interior molded door prices were raised,

fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

151.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Iowa Code §§ 553.1, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Iowa; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

50

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Kansas Statutes Annotated, §§ 50-101, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Kansas; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Maine; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

154.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the **Michigan Compiled Laws Annotated §§ 445.771,** *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Michigan; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

155.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Minnesota Annotated Statutes §§ 325D.49,** *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3)

members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Mississippi Code Annotated §§ 75-21-1, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Nebraska Revised Statutes §§ 59-801, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly,

members of the Price-Fixing Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Nevada Revised Statutes Annotated §§ 598A.010,** *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Nevada; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

159.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **New Hampshire Revised Statutes §§ 356:1,** *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **New Mexico Statutes Annotated §§ 57-1-1, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) members of the Price-Fixing Damages Class were deprived of free and open

competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **New York General Business Laws §§ 340,** *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout New York; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, members of the Price-Fixing Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **North Carolina General Statutes §§ 75-1, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **North Dakota Century Code §§ 51-08.1-01, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly,

members of the Price-Fixing Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

164.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Oregon Revised Statutes §§ 646.705, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Oregon; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

165.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Law **§§ 6-36-4, *et seq.***

61

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq.* Accordingly, members of the Price-Fixing Damages Class seek all forms of relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

166.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **South Dakota Codified Laws §§ 37-1-3.1, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Price-Fixing Damages Class were deprived of free and open

competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Tennessee Code Annotated §§ 47-25-101, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Utah Code Annotated §§ 76-10-3101, *et seq*.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Utah; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly,

members of the Price-Fixing Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

169.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Vermont Stat. Ann. 9 §§ 2453,** *et seq***.**

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Vermont; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

170.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **West Virginia Code §§ 47-18-1,** *et seq***.**

65

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

171.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the **Wisconsin Statutes §§ 133.01, *et seq.***

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) interior molded door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) members of the Price-Fixing Damages Class were deprived of free and open

competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded door.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, members of the Price-Fixing Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

172.     Members of the Price-Fixing Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Members of the Price-Fixing Damages Class have paid more for interior molded doors than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

173.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Price-Fixing Damages Class.

174.     Accordingly, Plaintiffs and the members of the Price-Fixing Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of

suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Price-Fixing Damages Class)

175.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

176.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

177.      Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the **Arkansas Code Annotated, § 4-88-101,** *et seq.*

(a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which interior molded doors were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of

the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of Defendants, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

178.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **California Business and Professions Code § 17200,** *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed interior molded doors in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(d)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of interior molded doors in the State of California within the meaning of Section 17200, California Business and Professions Code;

(f)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code;

(g)     Members of the Price-Fixing Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices;

(h)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future;

(i)     The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause the members of the Price-Fixing Damages Class to pay supracompetitive and artificially-inflated prices for interior molded doors. Members of the Price-Fixing Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Price-Fixing Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

179.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of **District of Columbia Code § 28-3901, _et seq._**

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which interior molded doors were sold, distributed or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Members of the Price-Fixing Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they

were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for interior molded doors. Defendants had the sole power to set that price and members of the Price-Fixing Damages Classe had no power to negotiate a lower price. Moreover, members of the Price-Fixing Damages Class lacked any meaningful choice in purchasing interior molded doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Price-Fixing Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of interior molded doors, including their illegal conspiracy to secretly fix the price of interior molded doors at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Price-Fixing Damages Class. Defendants took grossly unfair advantage of members of the Price-Fixing Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for interior molded doors.

(c)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Price-Fixing Damages Class were deprived of free

and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(d)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

180.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201,** *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Florida; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

181.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480, *et seq*.

(a)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supra-competitive, artificially inflated prices for interior molded doors.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

182.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of **Mass. G.L. c. 93A, §2.**

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling, and/or maintaining at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(c)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(d)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful, entitling members of the Price-Fixing Damages Class to multiple damages.

183.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010,** *et. seq.*

(a)     Plaintiffs and the Price-Fixing Damages Class purchased interior molded doors for personal, family, or household purposes.

(b)     Defendants engaged in the conduct described herein in connection with the sale of interior molded door in trade or commerce in a market that includes Missouri.

(c)     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to members of the Price-Fixing Damages Class.

(d)     Defendants concealed, suppressed, and omitted to disclose material facts to members of the Price-Fixing Damages Class concerning Defendants' unlawful activities and artificially inflated prices for interior molded door. The concealed, suppressed, and omitted facts would have been important to members of the Price-Fixing Damages Class as they related to the cost of interior molded doors they purchased.

(e)     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in interior molded door by making public statements that were not in accord with the facts.

(f)    Defendants' statements and conduct concerning the price of interior molded doors were deceptive as they had the tendency or capacity to mislead members of the Price-Fixing Damages Class to believe that they were purchasing interior molded doors at prices established by a free and fair market.

(g)    Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Missouri; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(h)    The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)    As a direct and proximate result of the above-described unlawful practices, members of the Price-Fixing Damages Class suffered ascertainable loss of money or property.

(j)    Accordingly, members of the Price-Fixing Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*,

15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

184.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.***

    (a)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Montana; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

    (b)     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

    (c)     As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured and are threatened with further injury.

    (d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

185.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **New Mexico Stat. § 57-12-1, *et seq.***

(e)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which interior molded doors were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(f)     The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Price-Fixing Damages Class and the prices paid by them for interior molded doors as set forth in N.M.S.A., § 57-12-2E. Members of the Price-Fixing Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for interior molded doors. Defendants had the sole power to set that price and members of the Price-Fixing Damages Class had no power to negotiate a lower price. Moreover, members of the Price-Fixing Damages Class lacked any meaningful choice in purchasing interior molded doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Price-Fixing Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of interior molded doors, including their illegal conspiracy to secretly fix the price of interior molded doors at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the

expense of members of the Price-Fixing Damages Class. Defendants took grossly unfair advantage of members of the Price-Fixing Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for interior molded doors.

(g)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(h)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(i)     As a direct and proximate result of the unlawful conduct of Defendants, members of the Price-Fixing Damages Class have been injured and are threatened with further injury.

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

186.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **New Hampshire Consumer Protection Act, N.H.**

**Rev. Stat. §§ 358-A, 1,** *et seq.*

(a)    Defendants willingly and knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which interior molded doors were sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(b)    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.H. Rev. Stat. §§ 358-A, 1, *et seq.*, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Price-Fixing Damages Class and the prices paid by them for interior molded doors as set forth in N.H. Rev. Stat. §§ 358-A, 1, *et seq.*. Members of the Price-Fixing Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for interior molded doors. Defendants had the sole power to set that price and members of the Price-Fixing Damages Class had no power to negotiate a lower price. Moreover, members of the Price-Fixing Damages Class lacked any meaningful choice in purchasing interior molded doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Price-Fixing Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of interior molded doors, including their illegal conspiracy to secretly fix the price of interior molded doors at supracompetitive levels and overcharge consumers, was substantively

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Price-Fixing Damages Class. Defendants took grossly unfair advantage of members of the Price-Fixing Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for interior molded doors.

(c)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of Defendants, members of the Price-Fixing Damages Class have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §§ 358-A, 1, *et seq*., and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

187.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of **N.Y. Gen. Bus. Law § 349,** *et seq.*

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed or obtained in New York and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(b)   Defendants made public statements about the prices of interior molded doors that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for interior molded doors; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)   Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased interior molded doors were misled to believe that they were paying a fair price for interior molded doors or the price increases for interior molded doors were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

(d)   Defendants knew that their unlawful trade practices with respect to pricing interior molded doors would have an impact on New York consumers and not just the Defendants' direct customers.

(e)   Defendants knew that their unlawful trade practices with respect to pricing interior molded doors would have a broad impact, causing consumer class members who indirectly purchased interior molded doors to be injured by paying more for interior

molded doors than they would have paid in the absence of Defendants' unlawful
trade acts and practices.

(f)  The conduct of the Defendants described herein constitutes consumer-oriented
deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which
resulted in consumer injury and broad adverse impact on the public at large, and
harmed the public interest of New York State in an honest marketplace in which
economic activity is conducted in a competitive manner.

(g)  Defendants' unlawful conduct had the following effects: (1) interior molded door
price competition was restrained, suppressed, and eliminated throughout New
York; (2) interior molded door prices were raised, fixed, maintained, and stabilized
at artificially high levels throughout New York; (3) members of the Price-Fixing
Damages Class were deprived of free and open competition; and (4) members of
the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices
for interior molded doors.

(h)  During the Class Period, Defendants' marketed, sold, or distributed interior molded
doors in New York, and Defendants' illegal conduct substantially affected New
York commerce and consumers.

(i)  During the Class Period, each of the Defendants named herein, directly, or
indirectly and through affiliates they dominated and controlled, manufactured, sold
and/or distributed interior molded doors in New York.

(j)  Members of the Price-Fixing Damages Class seek all relief available pursuant to
N.Y. Gen. Bus. Law § 349 (h).

188.  Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of **North Carolina Gen. Stat. § 75-1.1, *et seq*.**

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from members of the Price-Fixing Damages Class.

(b)     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which members of the Price-Fixing Damages Class could not possibly have been aware. Defendants publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of interior molded doors created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, and avoiding the creation of documents which would reveal the antitrust violations.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and

harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(e)     During the Class Period, Defendants' marketed, sold, or distributed interior molded doors in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed interior molded doors in North Carolina.

(g)     Members of the Price-Fixing Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the **Rhode Island Unfair Trade Practice and**

**Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.***

(a)     Members of this Price-Fixing Damages Class purchased interior molded doors for personal, family, or household purposes.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed, or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to members of the Price-Fixing Damages Class concerning Defendants' unlawful activities and artificially inflated prices for interior molded doors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' interior molded door prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(e)     As a direct and proximate result of the Defendants' violations of law, members of the Price-Fixing Damages Class suffered an ascertainable loss of money or property

as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of interior molded doors, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing interior molded doors at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to members of the Price-Fixing Damages Class as they related to the cost of interior molded doors they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

190.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of **South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10,** *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Price-Fixing Damages Class were deprived of free and open

competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, members of the Price-Fixing Damages Class have been injured in their business and property and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

191.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of **9 Vermont § 2451,** ***et seq.***

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which interior molded doors were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to members of the Price-Fixing Damages Class concerning their unlawful activities and artificially inflated prices for interior molded doors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants

misrepresented to all purchasers during the Class Period that their interior molded door prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) interior molded door price competition was restrained, suppressed, and eliminated throughout Vermont; (2) interior molded door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Price-Fixing Damages Class were deprived of free and open competition; and (4) members of the Price-Fixing Damages Class paid supracompetitive, artificially inflated prices for interior molded doors.

(d)     As a direct and proximate result of Defendants' violations of law, members of the Price-Fixing Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their omissions concerning the price of interior molded doors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing interior molded doors at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, members of the Price-Fixing Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Price-Fixing Damages Class)

192.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding

paragraphs of this Complaint as if fully set forth herein.

193.     Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*.

194.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of interior molded doors.

195.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Price-Fixing Damages Class for interior molded doors.

196.     Plaintiffs and the members of the Price-Fixing Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Price-Fixing Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Price-Fixing Damages Class may make claims on a pro rata basis.

197.     Pursuit of any remedies against the firms from which Plaintiffs and the members of the Price-Fixing Damages Class purchased interior molded doors subject to Defendants' conspiracy would have been futile.

### FIFTH CLAIM FOR RELIEF
### Violation of the Donnelly Act (N.Y. Gen. Bus. Law § 340)
### Conspiracy to Monopolize the Interior Molded Doorskin Market
### (on behalf of Plaintiffs and the Conspiracy to Monopolize Damages Class)

198.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

199.     Defendants intentionally combined and conspired to afford Jeld-Wen a monopoly over the Interior Molded Doorskin Market.  Defendants effected this conspiracy by, among other

things, agreeing that Masonite would not sell interior molded doorskins to any interior molded door manufacturer that competed against Defendants. Pursuant to this unlawful agreement, Masonite discontinued its sales of interior molded doorskins to competing interior molding door manufacturers, and has repeatedly refused to supply its competitors.

200.    For the reasons discussed above, Defendants acted with specific intent to effectuate Jeld-Wen's monopoly in the Interior Molded Doorskin Market in order to eliminate competition in the downstream Interior Molded Doors Market so they could effectuate their conspiracy to fix prices in that related market.

201.    As a direct and proximate result of Defendants' conspiracy to monopolize the Interior Molded Doorskin Market: (i) Jeld-Wen has charged supracompetitive prices to its customers for interior molded doorskins; (ii) Jeld-Wen has provided its customers with lower quality interior molded doorskins; (iii) interior molded door manufacturers that compete with Defendants have limited access to interior molded doorskins, the primary input for interior molded doors; and (iv) Defendants have been able to charge supracompetitive prices for interior molded doors.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    That the unlawful conduct, contracts, conspiracies, or combinations alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(b)     A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)     A *per se* violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(d)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(e)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contracts, conspiracies, or combinations alleged herein, or from entering into any other contracts, conspiracies, or combinations having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Price-Fixing Damages Class be awarded restitution,

93

including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: December 13, 2018

*/s/ Kristi Cahoon Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
**KELLY & CRANDALL, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7570
Fax: 703-591-0167
*kkelly@kellyandcrandall.com*
*aguzzo@kellyandcrandall.com*
*casey@kellyandcrandall.com*

Hollis Salzman
Kellie Lerner
William V. Reiss
Nahid A. Shaikh
**ROBINS KAPLAN LLP**

94

399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: 212-980-7400
Facsimile: 212-980-7499
*HSalzman@RobinsKaplan.com*
*KLerner@RobinsKaplan.com*
*WReiss@RobinsKaplan.com*
*NShaikh@RobinsKaplan.com*

K. Craig Wildfang
Geoffrey H. Kozen
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
*KCWildfang@RobinsKaplan.com*
*GKozen@RobinsKaplan.com*

Aaron M. Sheanin
Tai S. Milder
**ROBINS KAPLAN LLP**
2440 West El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: 650-784-4040
Facsimile: 650-784-4041
*ASheanin@RobinsKaplan.com*
*TMilder@RobinsKaplan.com*

*Counsel for Plaintiffs Allison Dellatore, Craig
Weitz, and the Proposed Classes*